Juan CORTEZ, Plaintiff,

v.

MTD PRODUCTS, INC., an Ohio Corporation, K Mart Corporation, et al., Defendants.

No. C–95–0990 WDB.

United States District Court, N.D. California.

March 18, 1996.

Brian T. Bonney, of the Law Office of Brian T. Bonney, Walnut Creek, CA, for plaintiff Juan Cortez.

Anthony S. Warburg, of Porter, Scott, Weiberg & Delehant, Sacramento, CA; Richard T. Coyne and Robert F. Coyne, of Wegman, Hessler, Vanderburg & O'Toole, Cleveland, OH, for defendants MTD Products, Inc., and K–Mart Corp.

## OPINION AND ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BRAZIL, United States Magistrate Judge.

In this Opinion and Order we announce our rulings on the motion for summary judgment that defendants filed on January 23, 1996. For the reasons set forth below, the motion is hereby GRANTED IN PART AND DENIED IN PART.

### BACKGROUND

Plaintiff, Juan Cortez, was injured while using a lawn mower that was manufactured by defendant, MTD Products, Inc., and sold by defendant, K Mart Corp. MTD manufactured the lawn mower in question on April 5, 1982. Def's Mot. for Summary Judgment at 12. Plaintiff's fiance (now wife) purchased the lawn mower at K–Mart some time in the summer of 1982. *Id.*

About twelve years later, on May 30, 1994, Cortez took the mower to his neighbor's yard to cut the grass. Deposition of Juan Cortez at 64–66. After he started the mower it began to leak oil. *Id.* at 80–84. Plaintiff attempted to wipe the oil from the lawn mower with a rag while the mower was still running. *Id.* at 83–85. The rag became entangled in the blades of the mower, pulling in Cortez' hand and causing the injuries giving rise to this litigation. *Id.* These facts are not disputed for the purposes of defendants' motion for summary judgment.

In this lawsuit plaintiff is pressing several different claims against the manufacturer and the seller of the lawn mower.[1] For purposes of the present motion, we can divide the claims into two groups: (1) those based on alleged shortfalls in the warning label that was affixed to the mower and (2) those based on the fact that the mower was not equipped with a Blade Control System (BCS).[2]

At the time of sale and the time of injury the lawn mower had affixed to it a label that warned users about the potential danger of the cutting blade. *See* 16 C.F.R. § 1205.6 (1995). Counsel for plaintiff conceded at oral argument that the label on this mower complied with the federal regulations (that indisputably were in effect at the time of manufacture) that prescribed requirements for warnings about the dangers associated with lawn mower blades. And defendants concede that the lawn mower that Mr. Cortez was using when he was injured was manufactured and sold without any blade control system.

The contention pressed by defendants in their motion for summary judgment is that all of the plaintiffs claims that are based on state common law are preempted by federal regulations.

### Does the Consumer Product Safety Act Preempt All State Common Law Claims?

■ We begin by acknowledging that there is a presumption against preemption. *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 662–64, 113 S.Ct. 1732, 1737, 123

---

1. The legal theories that the alleged underlying deficiencies implicate, according to plaintiff, include strict product liability, negligence, and negligent infliction of emotional distress.

2. A BCS stops the blades of the lawn mower when the operator removes his hands from the controls.

L.Ed.2d 387 (1993). The Supreme Court has admonished that state laws should not be superseded except when "the clear and manifest purpose of Congress" was preemptive. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Where the pertinent federal act contains a preemption clause the courts should attempt to ascertain Congress' intent about the scope of preemptive effect from the express language of the preemption clause. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 2617–18, 120 L.Ed.2d 407 (1992).

In this case we look to the Consumer Product Safety Act (CPSA), under which the lawn mower regulations are promulgated, to determine whether federal regulations preempt the instant state common law claims. 15 U.S.C.A. §§ 2051–2084 (West 1995). The CPSA contains a preemption clause which reads:

> (a) Whenever a consumer product safety standard under this chapter *is in effect* and applies to a risk of injury associated with a consumer product, no State or political subdivision of a State shall have any authority either to establish or to continue in effect any provision of a safety standard or regulation which prescribes any requirements as to the performance, packaging, or labeling of such product which are designed to deal with the same risk of injury associated with such consumer product, unless such requirements are identical to the requirements of the Federal standard.

15 U.S.C.A. § 2075(a) (West 1982) (emphasis added).

█ The wording of this preemption clause makes it apparent that Congress intended to preempt positive enactments (statutes, regulations issued by administrative agencies, etc.) by states that address the same risks of injury that are addressed by operative federal standards. *See Cipollone*, 505 U.S. at 518–24, 112 S.Ct. at 2618–22. The legal norms under which plaintiff attempts to proceed here, however, are not positive enactments; rather, they emerge from the common law. And courts have found it more difficult to decide whether federal statutes were intended to preempt not only positive enactments, but also state common law.

It is clear, from the authorities, that Congress has preempted state common law through some statutes. *Cipollone*, 505 U.S. at 521–23, 112 S.Ct. at 2619–21. What defendants' motion forces us to determine is whether Congress intended, through the CPSA, to preempt the particular common law claims that plaintiff presses here: the claims based on risks associated with warning labels and the claims based on risks associated with the absence of blade control systems. For the reasons described below, I find that Congress intended to preempt only the common law claims based on allegedly inadequate labeling and not the claims based on the absence of a blade control system.

### *Cipollone* and *CSX*

In *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), the Supreme Court wrestled squarely and at length with issues related to the preemptive effect of federal law on state common law claims. The high court was called upon to ascertain the reach of Congress' preemptive intent in two versions of a statute regulating cigarette labeling, one enacted in 1965 and the other in 1969. The 1965 version of the preemption clause was visibly narrower, only prohibiting states from requiring cigarette manufacturers to add warnings to packaging or advertising "other than the statement required by [the] Act." *Id.* at 514, 112 S.Ct. at 2616. A majority of the Justices on the Court held that Congress intended this clause to preempt only positive state enactments—not common law claims that might affect how the manufacturers cast warnings on their packages and in their advertising. *Id.* at 518–19, 112 S.Ct. at 2618–19.

The 1969 statute was worded quite differently and clearly had a broader preemptive reach. It forbad any "requirement or prohibition based on smoking and health [from being] imposed under State law with respect to the advertising or promotion of any cigarettes." *Id.* at 515, 112 S.Ct. at 2617. Speaking directly for only four justices, Jus-

tice Stevens concluded that Congress intended, through broader language like "requirement," "prohibition," and "State law," to extend the preemptive reach of the 1969 clause into the realm of the common law. At least two additional justices shared the view that the WDB 1969 clause extended the reach of preemption into the arena of common law.[3]

What separated the justices who joined in this view (six of them, at least), was not whether preemption extended into the realm of common law, but how far (i.e., which kinds of common law claims Congress intended to bar). But a majority appeared to endorse the notion, articulated by Justice Stevens in his plurality opinion, that "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.* (*quoting San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780–81, 3 L.Ed.2d 775 (1959)); *see also* Justice Scalia's opinion, concurring in the judgment in part and dissenting in part, at 505 U.S. at 548–49, 112 S.Ct. at 2633–35.

Any doubt left by *Cipollone* about whether the high court felt that preemption clauses like these could reach into the common law was eliminated less than a year later by a few words in *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In a part of the *CSX* opinion that all of the justices joined, the Court had no difficulty concluding that broad preemptive language in the Federal Railroad Safety Act barred some kinds of actions that purported to be based on legal "duties imposed on the railroads by the common law." *Id.* at 664, 113 S.Ct. at 1737. In support of this proposition, the Court cited Justice Stevens' opinion in *Cipollone,* characterizing the pertinent portion as holding that the "federal statute barring additional 'requirement[s]

... "imposed under state law"' pre-empts common-law claims," and indicated that Justice Scalia's separate opinion showed that he and Justice Thomas shared this view. *Id.* at 662–66, 113 S.Ct. at 1737–38.

When we compare the language used by Congress in the 1969 preemption clause in issue in *Cipollone* to the language used by Congress in the preemption clause in the CPSA we are constrained to conclude that the latter, like the former, extends the possible reach of preemption into common law arenas. The 1969 Cigarette Smoking Act declared that "[n]o *requirement or prohibition* based on smoking and health shall be imposed *under State law* ... [with respect to certain matters]." 15 U.S.C.A. § 1334(b) (emphasis added). The preemption clause in the CPSA, by contrast, prohibits states and their political subdivisions from establishing or continuing in effect "any provision of a safety *standard or regulation* which prescribes any *requirements*" as to certain matters. 15 U.S.C.A. § 2075(a) (emphasis added).

We see no principled basis for distinguishing the language in the latter statute from the language in the former. Both advert to "requirements," and there is no apparent difference, for purposes of measuring preemptive reach, between a "requirement or prohibition ... based on State law," on the one hand, and, on the other, a "standard or regulation" established by a State or one of its political subdivisions.

Plaintiff argues that the savings clause in the CPSA preserves all state common law claims.[4] We are not persuaded. The Federal Railroad Safety Act of 1970 that was the subject of the Supreme Court's attention in *CSX, supra,* included a savings clause, but that fact did not prevent the Court from holding that Congress intended that Act's preemption clause from displacing some common law claims. *Cf. CSX,* 507 U.S. at 674–76, 113 S.Ct. at 1743. Other courts also have

---

**3.** See the opinion of Justice Scalia, joined by Justice Thomas, concurring in judgment in part and dissenting in part.

**4.** The general savings clause in the CPSA reads:

(a) Compliance with consumer product safety rules or other rules or orders under this chapter shall not relieve any person from liability at common law or under State statutory law to any other person. 15 U.S.C.A. § 2074 (West 1982).

held that the existence of a savings clause does not preclude preemption of some common law claims.

The precedent most squarely on point is the recent Eighth Circuit decision in *Moe v. MTD*, 73 F.3d 179, 182 (8th Cir.1995), where the Court of Appeals explicitly rejected the contention that the purpose of the savings clause in the CPSA was to preserve all claims based on state common law. Concluding that interpreting the savings clause as having that sweeping effect would threaten the basic statutory objective of federal uniformity, the *Moe* court ruled that the purpose of the savings clause was simply to assure the vitality of "those claims that are not expressly preempted." *Id.* at 183. *See also Carstensen v. Brunswick Corporation*, 49 F.3d 430 (8th Cir.1995), *cert. denied* — U.S. ——, 116 S.Ct. 182, 133 L.Ed.2d 120 (1995); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); and *Mitchell v. Collagen Corp.*, 67 F.3d 1268, 1276 (7th Cir.1995).

■ We agree with the Eighth Circuit's analysis and hold that the savings clause leaves intact only those state law claims whose enforcement would not result in imposition of requirements or regulations with respect to a matter already actually being regulated by federal authorities under the CPSA.

■ For all the reasons set forth above, we hold, just as the Court of Appeals for the 8th Circuit recently did in *Moe*, that Congress intended the CPSA to extend the reach of its preemption into the common law. We also hold, again with the *Moe* court, that Congress did not intend the CPSA to preempt every conceivable common law based claim. Rather, the Act preempts only those claims whose effect would be to prescribe requirements related to the performance, packaging, or labeling of power mowers that deal with the same risk of injury that is dealt with by a federal standard that is then in effect. So the question to which we must turn now is this: which, if any, of the plaintiff's common law based claims are preempted by the CPSA?

### Failure to Warn

■ Plaintiff concedes that federal regulations covering warning labels were in effect at the time the lawn mower that injured Mr. Cortez was manufactured—and that the warning label on that mower conformed fully with those federal regulations. The federal regulations prescribed exactly what a lawn mower manufacturer needed to provide in its warning labels. *See* 16 C.F.R. § 1205.6. The regulations told the manufacturer exactly what to print on the label, in what color, and in what dimensions. *Id.*

In *Moe v. MTD*, a case also involving a power mower, the Eighth Circuit found that the plaintiff's failure to warn claim was preempted by the labeling regulations promulgated under the CPSA. *Moe*, 73 F.3d at 183. The *Moe* court concluded that the effect of permitting the plaintiff to proceed on his failure to warn claim would be to risk creating a "requirement" for labeling that was not the same as the clearly applicable federal regulation. *Id.* at 182.

That such a result would be threatened here, as well, is evidenced by the fact that counsel for plaintiff conceded in oral argument that the label on the lawn mower that Mr. Cortez was using at the time of the accident in the case at bar conformed exactly to the federal standard. Yet plaintiff contends that that federally-prescribed warning label was insufficient under California common law. The effect of permitting the plaintiff to recover on such a theory would be to subject defendants to two different regulations of exactly the same subject. It is that effect that Congress intended to prevent through the preemption clause of the CPSA. *See id.* at 182–83.

Stated differently, permitting plaintiff to recover on his failure to warn theory would upset the careful balancing of interests that Congress, through the Commission, sought to achieve when it prescribed the warning label regulations. It follows that we must HOLD that plaintiff's claims for strict liability, negligence, and negligent infliction of emotional distress that are BASED ON DEFENDANTS' ALLEGED FAILURE TO WARN are preempted and therefore DISMISSED WITH PREJUDICE.

## Defective Design

■ We confront a very different situation when we consider the claims that plaintiff bases on the absence of a blade control system from the lawn mower he was using when he was injured. The fundamental issue with respect to these claims, in the language of the preemption clause, is whether, at the time this mower was manufactured, there was "in effect" a federal safety standard that covered the risk in question (the risk that the blades would cause injury to the body of the operator). This is the key issue because the preemption clause, by its own terms, operates only when an applicable federal standard "is in effect". 15 U.S.C.A. § 2075(a); *Cf.* 16 C.F.R. § 1205.2 (1995).

Defendants contend that an applicable federal standard was "in effect" at the time this mower was manufactured even though Congress had postponed the effective date of the regulations requiring mowers like this to have blade control systems until a few months later (i.e., until June 30, 1982). In support of this contention, defendants argue that the absence of an affirmative regulation of this subject did not mean that no federal regulating was taking place. Instead, they contend that the federal regulators were indeed regulating this subject during this period (i.e., the period when Mr. Cortez' mower was manufactured, earlier in the spring of 1982)—and that the content of the alleged federal regulation was that, during this period, mowers without blade control systems satisfied federal standards.

In support of this argument defendants contend that the courts have held, generally, that a *decision by a duly authorized federal agency not to regulate has the same preemptive effect as a decision to regulate.* I conclude that defendants have taken this concept out of context and, in so doing, have extended its meaning beyond the intentions of its authors.

The case on which defendants' primarily rely in support of this notion is *Carstensen v. Brunswick Corp.*, 49 F.3d 430, 431 (8th Cir. 1995). But the regulatory situation was very different there than it is here. In that case, the Coast Guard (which was the federal agency responsible for regulating in the pertinent area) had "specifically rejected proposed regulations requiring the use of propeller guards" (plaintiff had claimed the boat's motor that had injured her was defectively designed because it had no propeller guard). *Id.* at 431.

Significantly, the Coast Guard had been persuaded that *the accident data did not support requiring propeller guards* on motorboats. *Id.* So, instead of determining that there was a need for regulations, formulating those regulations, and then postponing their effective date (to give industry an opportunity to make the transition with as little disruption as possible), the Coast Guard had decided that the appropriate regulation of this subject (propeller guards) was no regulation at all. This was not a temporary decision, but one of indefinite duration. It was in that specific context that the Court of Appeal invoked the notion that a "decision not to regulate has the same preemptive force as a decision to regulate." *Id.* at 431.

The situation in the case at bar is very different. Here, the relevant federal agency clearly had decided that the accident data justified requiring blade control systems. *See Safety Standard for Walk–Behind Power Lawn Mowers,* Part 1205, Consumer Product Safety Commission, Federal Register for February 15, 1979, at 9994, 9996 (finding that some 77,000 injuries per year were suffered because of contact with the blades of walk-behind power mowers, and that that number would be reduced by about 46,500 by imposing the new blade control requirements). After conducting their study and making a clear determination about what the regulations should be (i.e., after determining that requiring blade control systems would have a positive net effect), the issue was not whether such requirements were appropriate, but only when they should become effective.

To fix the date that the regulations would take effect, the Commission balanced "(1) the need for the standard in order to reduce the risk of injury associated with walk-behind mowers and (2) the possible adverse economic effects caused by the shorter effective dates." *Id.* at 9999. In other words, the restraint on earlier implementation was not

indecision about the value of or the need for the regulation (there was no indecision about what the contribution to safety would be), but only concern that implementing the regulations any earlier than proposed would cause considerable economic disruption.

So, unlike the situation in *Carstensen,* where the federal agency had decided that the federal regulation should consist of no regulation at all because the accident data failed to support the need, here the federal agency clearly had decided that the accident data showed the need for affirmative, prescriptive regulations—and clearly had decided what the substance of those regulations should be. So the decision to postpone the effective date was really a decision about when to begin regulating, not a decision that the accident data would not support any regulatory intervention until late 1981 or mid–1982. *See Freightliner Corp. v. Myrick,* —— U.S. ——, ——, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995).

■ This is a fundamental difference for purposes of preemption analysis under the CPSA. We are instructed by the authorities to take Congress at its word when we construe preemption statutes—to rely on the words Congress used unless they are unclear and cannot support a reliable inference about Congress' intent. *Cipollone,* 505 U.S. at 517, 112 S.Ct. at 2617–18. In our case, the words could not be clearer. The statute expressly calls for preemption only "[w]henever a consumer product safety standard under this chapter *is in effect* ..." 15 U.S.C.A. § 2075(a). As I read the history of the blade control system regulations, Congress decided that those regulations would not be "in effect" until after the mower in our case was manufactured. Since no federal regulation on this subject was in effect at the relevant time, there can be no federal preemption. This conclusion is consistent with our obligation to read preemption statutes narrowly and with the presumption against preemption. *Cipollone,* 505 U.S. at 517, 112 S.Ct. at 2617–18; *CSX,* 507 U.S. at 662–665, 113 S.Ct. at 1737–38; *Freightliner,* —— U.S. at ——–——, 115 S.Ct. at 1487–88.

Defendants' contention that the "prohibited stockpiling" portion of the regulations reflects a federal judgment that, before June 30, 1982, mowers without blade control systems satisfied federal regulators also is not persuasive. *See* 16 C.F.R. § 1205.7 (1995). That section *prohibits* manufacturers from producing more than certain numbers of lawn mowers without blade control systems prior to the effective date of the new regulations; it represents a negative limitation, not a positive endorsement or authorization. It was intended to ensure that the safety purposes of the federal government's subsequent entry into the regulatory field would not be frustrated by the presence on the market for many years of mowers that the Commission had already concluded created unacceptably high risks of injuries.

In our case, the federal authorities decided that they would not begin regulating blade control systems until mid–1982. They postponed until then their entry into this regulatory field. Since they were not regulating this particular subject at all when the lawn mower that Mr. Cortez used was manufactured, I hereby HOLD THAT HIS COMMON LAW CLAIMS BASED ON THE ABSENCE OF A BLADE CONTROL SYSTEM ARE NOT PREEMPTED. Plaintiff is entitled to a trial in this court on these claims.

### THE REQUEST TO CERTIFY FOR IMMEDIATE APPEAL

By letter dated March 6, 1996, defendants asked that I certify for immediate appeal under 28 U.S.C. § 1292(b) the part of this Order denying summary judgment on those claims by plaintiff that are based on the absence from the lawn mower of a blade control system.

■ In this Circuit, certification under section 1292(b) is to occur "only in exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation." *In re Cement Antitrust Litigation (MDL No. 296),* 673 F.2d 1020 (9th Cir.1981), *aff'd Arizona v. Ash Grove Cement Co.,* 459 U.S. 1190, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983); *see also Mateo v. M/S KISO,* 805 F.Supp. 792, 799 (N.D.Cal.1992), where Judge Jensen wrote: "This statute exists for those exceptional circumstances

where considerations of judicial economy and fairness demand interlocutory review of an order. The party seeking certification of an interlocutory appeal has the burden to show the presence of those exceptional circumstances."

 Defendants' two paragraph letter request for certification under this statute makes no meaningful attempt to meet this demanding standard. But I would decline to certify this matter under § 1292(b) even *if* defendants had submitted the kind of papers called for under the statute.

Clearly, disposition of that part of defendants' motion that focuses on the claims based on the absence of a blade control system turns on a question of law: were there federal regulations of this subject "in effect" when the mower was manufactured? And I am not prepared to say that reasonable people could not disagree about what the answer to this controlling legal question is, though the more I have thought about it the stronger my feeling has become that postponing the date of entry into this regulatory arena cannot be equated with regulating it. So it is not clear to me that there is "substantial ground for difference of opinion," as the statute requires.

It is the third, independent requirement of the statute, however, that is most clearly not satisfied in the circumstances of this case. Since "considerations of judicial economy and fairness" clearly do not demand interlocutory review, *Mateo, supra,* I cannot say, in the language of § 1292(b), that "immediate appeal" would "materially advance the ultimate termination of the litigation."

This case is scheduled to go to trial on May 14th of this year, less than two months from now. Virtually all pretrial preparation is to have been completed soon. The trial will consume only four or five days—and its outcome could render moot any need for the Court of Appeals to address the legal question that defendants seek to certify. Moreover, if plaintiff prevails at trial, defendants will have access to appellate consideration of this legal issue only a few months (at the worst) after they would have that access were I to grant the requested certification now. Given these considerations, and the

fact that this case already has been pending in this court for a year, it would not be fair to plaintiff either to postpone the trial for a considerable period or to force him to respond to an interlocutory appeal at the same time he is engaged in final pretrial preparations. Nor, in these circumstances, would we be justified in imposing prematurely on the resources of the Court of Appeals (I point out, again, that the outcome at the forthcoming trial might make any such imposition completely unnecessary).

For all these reasons, the defendants' request for certification under 28 U.S.C. § 1292(b) is hereby DENIED.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is hereby GRANTED IN PART AND DENIED IN PART. Plaintiff's claims based on a failure to warn are HEREBY DISMISSED with prejudice; plaintiff's claims based on defective design remain to be tried.

IT IS SO ORDERED.